IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

K. KABASHA GRIFFIN-EL, also known       )
as KEITH FEDELE GRIFFIN,                )
                          Petitioner    )
                                        )
       vs.                              )       Civil Action No. 08-1018
                                        )       Judge Nora Barry Fischer/
SUPERINTENDENT DAVID                    )       Chief Magistrate Judge Amy Reynolds Hay
DIGUGLIELMO; THE DISTRICT               )
ATTORNEY OF THE COUNTY OF               )
ALLEGHENY; THE ATTORNEY                 )
GENERAL OF THE STATE OF                 )
PENNSYLVANIA,                           )
                        Respondents     )

REPORT AND RECOMMENDATION

I.      Recommendation

       It is respectfully recommended that the habeas petition filed pursuant to 28 U.S.C. § 2254

be dismissed as time barred or, in the alternative, as being meritless and that a certificate of

appealability be denied.

II.     Report

       K. Kabasha Griffin-El, a/k/a/ Keith Fedele Griffin, ("Petitioner"), is a state prisoner,

currently serving a life sentence for the first degree murder of the mother of his then estranged

girlfriend.  He has filed his Section 2254 petition seeking to attack a jury verdict of guilt obtained

on September 4, 1996.  Although the Commonwealth had sought the death penalty, the jury was

unable to reach a unanimous verdict on the death penalty and so on September 5, 1996, the trial

court sentenced Petitioner to life in prison for the first degree murder.

Because the petition is time-barred, it should be dismissed.  In the alternative, because the PCRA trial court addressed all of the issues on the merits and found them wanting, and because Petitioner has failed to argue much less demonstrate that the PCRA trial court's disposition of the claims was contrary to or an unreasonable application of United States Supreme Court precedent, the petition should be dismissed as meritless.

**A.  Relevant Facts and Procedural History**

The facts underlying the crime as revealed by the testimony at trial are as follows.[1] Petitioner began living with his girlfriend, Shashi Shields, in 1993, and the couple had a son, Alonte, who was born on June 9, 1995.  (TT 56, 58).  Ms. Shields moved out of the residence that she shared with petitioner approximately two and a half (2½) months prior to the baby's birth, and moved in with her mother, Lavorde Allen, at Ms. Allen's home.  (TT 58).  Ms. Shields' other son, Troy, and her sister, Ronni Allen, also resided in that home.  (TT 59, 142).

On July 5, 1995, petitioner called the home several times looking to speak with Ms. Shields, who was not at home.  (TT 67, 143-44).  When Ms. Shields returned at approximately 4:00 p.m., her mother and sister both told her that petitioner had been calling for her.  (TT 67).  Ms. Shields called petitioner back.  (TT 67- 68).  Petitioner asked to see Alonte, but Ms. Shields told him to give her some time because she was breastfeeding him.  (TT 69).  Petitioner became irritated and Ms. Shields tried to calm him down.  (TT 69).  Petitioner then asked to speak with Ms. Shields' mother.  (TT 70, 145).  After Lavorde Allen took the telephone, petitioner began screaming at her, causing her to tell petitioner not to raise his voice at her.  (TT 70, 145-46).

---

[1]  The factual history is taken mostly from the answer.

Approximately ten or fifteen minutes later, petitioner showed up at the home, banging on the door and screaming things such as, "Open the door," "I want my son," and "Don't make me knock this door down." (TT 71, 146-47). Lavorde Allen called 911. (TT 71). Petitioner proceeded to rip the screen out of the living room window, stood there for a few moments and then got in his car and drove away. (TT 71-72). Ms. Allen, who was still on the telephone with police, informed them that petitioner had left. (TT 72).

About ten minutes later, petitioner called Ms. Shields and told her that she had acted like she was not scared of him anymore and that he needed to put fear back in her heart. (TT 73). He also told her that he loved her and that he was prepared to die for her that night. (TT 73). Ms. Shields then called 911; while she was on the telephone, petitioner pulled back up to the front of the house. (TT 73). Ms. Shields told City of Pittsburgh police officer Tracey Williamson, who was working with the telephone reporting unit at the time in question, that petitioner had guns and "he's going to kill me." (TT 260). Officer Williamson told Ms. Shields to take the children into a bedroom and lock the door. (TT 73-74, 260). As Ms. Shields was climbing the stairs of the house, she heard shots being fired that sounded like they were hitting the front door. (TT 74). Officer Williamson, through the receiver, also heard approximately three (3) shots. (TT 260).

Ms. Shields, her mother, her fifteen year old sister, her three year old son and her infant son all entered Lavorde Allen's bedroom. (TT 74-75; 149-51, 159). Through the telephone, Officer Williamson heard a different adult female voice say, "Keith, don't come up here. Keith, go back out the house. Keith, don't do this. We don't need this today." (TT261) The telephone then went dead. (Id.). Ms. Shields heard petitioner come up the steps, and she and her sister heard him then shoot at the locked bedroom door. (TT 79, 152). The two saw their mother fall

to the ground.  (TT 79, 152-53).  Ms. Shields ran over and knelt by her mother.  (TT 79, 153).

Ms. Shields and her sister then saw petitioner enter the bedroom and shoot their mother in the

face.  (TT 83, 153).

Petitioner attempted to place bullets in a new ammunition clip.  (TT 84-85, 153).  Ms.

Shields turned to place Alonte down on the bed.  (TT 85).  As she did so, petitioner struck her in

the back of the head with a gun, saying, "You f_ _ _king b_ _ _h.  Look what the f_ _ _ k you

made me do."  (TT 85-86, 153).  Ms. Shields began bleeding onto the baby, who was still in her

arms when she was first struck.  (TT 85-86, 153, 156).  She was hit approximately six times—in

various parts of the body—before losing consciousness.  (TT 86).  During the assault of Ms.

Shields, her sister, Ronni Allen, took three-year-old Troy and ran out of the room to the

neighbors' house.  (TT 157).

City of Pittsburgh Police Officer R. Thomas Jacques and his partner Timothy Westwood

received a dispatch to the home of Ms. Shields to investigate reports that shots had been fired

into the house.  (TT 271-73, 322-23).  City of Pittsburgh Police Officer Charles Higgins was also

dispatched to the residence.  (TT, 330-31).  Officers Jacques, Westwood and Higgins entered the

residence along with Officer Merlina.  (TT 276-78, 323, 333).  The officers heard a male voice

saying, "Help my baby."  (TT 278, 333).  Officers Jacques and Higgins ordered the man to come

downstairs with his hands first.  (TT 278, 333).  The man—identified as petitioner—eventually

made his way down the stairs carrying his baby; both petitioner and the baby had blood on them.

(TT 278-81; 333-34).  Officer Jacques took the baby from petitioner and removed him from the

house.  (TT 280-82).

4

After giving the baby to another officer, Officer Jacques returned to the residence.  (TT 282-83).  Officer Westwood, who had instructed petitioner to lie on the ground, placed petitioner in handcuffs and conducted a search of his person.  (TT 283, 324).  An empty gun holster was found in petitioner's left front waistband.  (TT 324).  Officer Jacques proceeded to the upstairs of the house with Officer Higgins and Officer Schanck.  (TT 283, 334-35).

The officers found the dead body of Lavorde Allen on the floor of the bedroom.  (TT 284-85, 335).  They then noticed Ms. Shields' body in the corner of the room attempting to draw a breath.  (TT 285, 336).  There was an extreme amount of blood in her face and hair.  (TT 337).  Officer Higgins tilted Ms. Shields' head back slightly so that she could breathe until the paramedics arrived.  (TT 337-38).  Ms. Shields was taken by paramedics to Presbyterian Hospital, where she regained consciousness.  (TT 87, 288).

Petitioner was brought to the homicide offices at 7:18 p.m. and met with Detectives Dennis Logan and Carl Robinson.  (TT 457-58).  He was read his rights from a pre-interrogation warning form, which he signed.  (TT 460).  Petitioner indicated that he understood his rights and agreed to waive them so that he could give a statement regarding what he knew about the death of Lavorde Allen.  (TT 461).

Petitioner told Detective Logan that he was going on a job interview in Virginia the following day and wanted to see his son before he left.  (TT 462).  He said that after phoning Lavorde Allen's residence several times that day, he finally spoke with Ms. Shields.  (TT 463).  Petitioner admitted that the conversation between the two of them became heated and that he also got into an argument with Ms. Allen after she got on the telephone.  (TT 463-64).  Petitioner then

drove to the residence and began pounding on the door.  (TT 465).  He left because he heard Ms. Allen on the telephone with police.  (TT 465).

After another argumentative telephone call with Ms. Shields, petitioner returned to the residence and tried to knock the front door down with his shoulder when he was not allowed inside.  (TT 465).  Petitioner then attempted to shoot off the lock.  (TT 466).  When that failed, petitioner entered the house through the window.  (TT 466).  He climbed the steps and went directly to Ms. Allen's bedroom, where he began pounding on the locked door.  (TT 466).  Petitioner then shot the lock off the door.  (TT 466-67).

Petitioner admitted to Detective Logan that he then entered the bedroom and shot Lavorde Allen.  (TT 467).  He stated that at this point his .45 jammed, and he took out his .380 Walther and began beating Ms. Shields with it.  (TT 467).  Petitioner thought that Ms. Shields had been shot because the gun went off during the beating.  (TT 467, 470).  He told Detective Logan that he shot Ms. Allen and pistol-whipped Ms. Shields because he was mad about the fact that he was not allowed to see his son.  (TT 469).  "I'm an old-fashioned type man," he told the detective, "and ain't no woman going to be talking to me that way, and she knows that."  (TT 470).

An autopsy was performed on the body of Lavorde Allen at 9:30 a.m. on July 6, 1995, by Dr. Abdulrezak Shakir.  (TT 364).  Dr. Shakir found that the cause of Ms. Allen's death was a gunshot wound to the face.  (TT 371).  He concluded that the gun was between six (6) and twenty-four (24) inches from the victim's face when it was fired.  (TT 367).  Shashi Shields had surgery to treat multiple lacerations to the back of her head and forehead as well as fractures of

her hand.  (TT 87-88, 489-91).  She remained hospitalized for approximately eight (8) days.  (TT 88).

The Court notes that Petitioner took the stand in his own defense at trial and explained his version of the events.  The jury, apparently not crediting his version of the events, convicted him of first degree murder in the death of Ms. Lavorde Allen, and also convicted him of, inter alia, one count of burglary, and one count of Aggravated Assault on Ms. Shields.  As noted above, the Trial Court sentenced Petitioner to life in prison on the first degree murder charge.  The Trial Court also sentenced him to 10 to 20 years on the Burglary conviction and 10 to 20 years on the aggravated assault conviction, which sentence was to be served consecutive to the sentence for the burglary conviction.

On January 15, 1997, post sentencing motions were denied by the Court of Common Pleas of Allegheny County.  On August 20, 1997, Petitioner filed in the trial court, an application for leave to file a nunc pro tunc appeal, which was granted.  After some intervening procedures, Petitioner, through counsel, filed his brief in the Superior Court, which affirmed the convictions on November 17, 2000.  On December 18, 2000, Petitioner, through counsel, filed a Petition for Allowance of Appeal ("PAA") in the Pennsylvania Supreme Court, which denied the PAA on April 10, 2001.

Waiting for more than one year, Petitioner did not sign his pro se PCRA petition until June 24, 2002, Dkt. [11-6] at 11, and the Court of Common Pleas apparently did not receive/docket it until June 28, 2002.  Id., at 1.  After appointing counsel, Petitioner appeared with counsel for a hearing before the PCRA trial judge, who was also the judge that presided over Petitioner's trial.  The hearing was to address Petitioner's desire to proceed without counsel

7

in his PCRA proceedings.  On May 7, 2003, the PCRA trial court found that Petitioner waived

his State law right to receive the assistance of counsel during the PCRA proceedings, and

permitted Petitioner to proceed pro se.   On October 6,  2005, the PCRA trial Court filed a notice

of intent to dismiss the pro se PCRA petition.  On November 28, 2005, the PCRA trial court

dismissed the petition.

On December 29, 2005, Petitioner filed a pro se notice of appeal in the Superior Court.

On November 20, 2006, Petitioner's appeal was dismissed for failing to file a brief.

Waiting for nearly one year exactly, Petitioner signed on November 19, 2007, a pro se

Section 2254 habeas petition which he filed in the United States District Court for the Eastern

District of Pennsylvania.  At the time, Petitioner was housed in a prison which was located

within that judicial district.  The petition was not received and docketed by that Court until

November 27, 2007.   In that Petition, the following grounds were raised:

> Ground One: Denial of Counsel of Choice . . .  Trial Judge Jeffrey
> Manning, forced Petitioner's privately paid Attorney (Joseph Hudak, Esq.) to
> withdraw as Petitioner's [trial] Counsel, in breach of Petitioner's private
> contractual agreement with Attorney Hudak.

[Griffin-El v. Diguglielmo, No. 2:07-CV-4995 (E.D. Pa. Dkt. [1] at 9)]

> Ground Two: Governmental Interference . . . .

[Griffin-El v. Diguglielmo, No. 2:07-CV-4995 (E.D. Pa. Dkt. [1] at 9)]

> [Underlying Facts:] Petitioner declares that with depraved indifference and
> flagrant disregard for Petitioner's ongoing [State] appellate process and
> constitutional rights, on the 4th day of August A.D. 2005, without cause or
> provocation, Corrections Officers Earl E. Thomas and Thomas Scarpati, seized
> Petitioner's legal materials intended for use in Petitioner's PCRA and subsequent
> appeals, including but not limited to: Legal reference books, briefs, legal strategy
> in the form of personal notes, affidavits, medical records, case law, receipts, return

receipts, green cards, proof of purchase, proof of publications, durable powers of attorneys, religious materials.

On May 5, 2006, Correctional Officers Jason Dombrosky and Ronald Quick subjected Petitioner to yet another seizure of additional legal documents, legal books, business books, and several other important papers.  To date none of Petitioner's personal and legal property has been returned to him.

Said unlawful acts by said officers while under color of state law are tantamount to "Governmental Interference" and "Obstructing Justice," which has impeded Petitioner's ability to access the courts, thereby denying Petitioner due process of law, where Petitioner was denied the opportunity to present his arguments to the appellate courts, resulting in the dismissal of his Post Conviction Relief Act Petition (PCRA), and subsequent appeal to the Superior Court.

. . . .

This Extraordinary writ is filed by necessity in response to governmental interference, resulting in obstruction of justice which has impeded both Petitioner's ability to pursue his a writ.

[Griffin-El v. Diguglielmo, No. 2:07-CV-4995 (E.D. Pa. Dkt. [1-2] at 4)]

Ground Three: Denial of Access to the Courts . . . . [The supporting facts are the same as the supporting facts for Ground Two].

[Id., Dkt. [1] at 9.]

Ground Four: Ineffective Assistance of Counsel

[Id.]

Supporting Facts . . . . Appeal Counsel misled Petitioner to believe that Denial of Counsel of Choice Would be appealed, yet refused to raise issue in Briefs to state Appellate Courts.

All other issues are addressed at paragraph 11(d) above.

[Id., at 10, ¶ 13.]

The Magistrate Judge in the Eastern District, filed a Report, noting that Petitioner raised four issues: namely, (1) denial of counsel of choice, [i.e., Ground One], (2) ineffective assistance of appellate counsel [i.e., Ground Four], (3) denial of access to his legal materials, [i.e., Ground Two], and (4) denial of access to Courts [i.e., Ground Three].  Id., (Dkt. [3] at 2).  The Magistrate

Judge went on to recommend that Issues 1 and 2 be transferred to this court and that Issues 3 and 4 be dismissed for challenging the conditions of his confinement and hence, not being cognizable in habeas corpus. Id. The Report recognized that Petitioner "has already brought these issues [i.e., the non-cognizable issues, challenging the conditions of confinement] in a civil rights suit, which is currently proceeding before the Honorable Timothy Savage. See Kabasha Griffin-El v. Beard, No. 06-2719. . . ." Id., (Dkt. [3] at 3).

Petitioner filed objections to the Report. Id., (Dkt. [4]). In those objections, he clarified that he was not raising just four claims but that he was also raising those claims which he had recounted in the habeas petition at ¶ 11(a)(3), which were the very same claims he had raised in his pro se PCRA petition. Petitioner claims that it was his intention to raise in the habeas petition each of the grounds that he raised in his PCRA petition. Id., (Dkt. [4] at 4, ¶¶ 10-11). Over his objections, the District Judge adopted the Report and Recommendation and dismissed the two non-cognizable claims albeit without prejudice to Petitioner pursuing those claims in his pending civil rights action, and transferred the two cognizable claims to this Court. Id., (Dkt. [5]). The two remaining claims, denial of counsel of choice and ineffective assistance of appellate counsel, as well as, presumably, those claims raised in the PCRA petition, which Petitioner asserts he was also raising in his habeas petition, were transferred here.

This Court received the petition on July 21, 2008. Unfortunately, the petition was not scanned properly since it omitted the back of some of the pages where Petitioner had continued his pleading. Griffin-El v. Diguglielmo, No. 08-1018 (W.D. Pa. Dkt. [1]). This Court then obtained from the Eastern District a complete petition and, contemporaneously with this Report, is directing the Clerk's office to file, as a corrected habeas petition, the one that was filed in the

10

Eastern District.  Although the Respondents were served with a copy of the petition that did not

include the writing on the back of the pages, Dkt. [10] at 18 to 21, the District Attorney discerned

that Petitioner was raising in the instant petition those claims that he had raised in the pro se

PCRA petition, id., and consequently addressed those issues as well.[2]

---

[2]  The claims raised in the pro se PCRA petition, which Petitioner also raised in the instant
habeas petition are as follows:

> 11(a)(3)
> A.  AFTER DISCOVERED EVIDENCE:
> 1.  The Petitioner has recently become aware of the fact that he has been
> diagnosed with the following Mental Disorders and that he was afflicted with said disorders at
> the time he committed the charged crimes: Post-Traumatic Stress Disorder; Borderline
> Personality Disorder; Major Depression, and Intermittent Explosive Disorder.  The absents [sic]
> of said evidence at trial, deprived the trier of fact of mitigating evidence regarding the
> Appellant's ability to formulate the specific intent to kill such as would tend to reduce the degree
> of homicide from first degree to third degree murder. . . . .
>
> B.  INEFFECTIVE ASSISTANCE OF COUNSEL:
> 2.  Petitioner avers that [direct] appellate counsel was ineffective for failing to properly
> raise, preserve and litigate:
> (1).  Trial counsel's ineffectiveness for failing to preserve for appeal, [the] trial
> court's abuse of discretion (which denied Appellant this [sic] right to counsel of choice) whereby
> the court erroneously force[d] Appellant's privately retained counsel (Attorney Joseph E.
> Hudak), to withdraw as counsel of record . . . .
> (2).  Trial Counsel's ineffectiveness for failing to present Diminished Capacity
> as a defense despite the fact that trial counsel knew, or should have known of Appellant's
> diagnoses of [mental health conditions] . . . .
> (3).  Trial counsel's failure to call Psychiatrist Robert Wettstein, as a [sic] expert
> witness during the trial [i.e., guilt] phase, where said testimony during the sentencing phase,
> established that the Appellant's diminished capacity at the time he committed his criminal acts,
> rendered him incapable of forming the deliberation and premeditation necessary to formulate a
> specific intent to kill. . . .
> (4).  Trial counsel's failure to raise, preserve, and litigate trial court's error of
> removing juror number eleven (#11) Ms. Claire Little, and replacing her out of sequence with
> alternate juror number four (4) Ms. Vikki Potteman, depriving Appellant of his right to a fair and
> impartial jury . . . .
> (5).  Trial counsel's failure to raise, preserve, and litigate trial court's failure to
> randomly or indifferently select jurors to be individually voir dire [sic] where during the
> selection of August 22, 1996, upon the appellant's objection to an all white jury panel, the court
> hand selected two African Americans to appear on the panel.
> (6).  Trial counsel's failure to raise, and present two vital mitigating
> circumstances during trial and sentencing:

In the Answer, Dkt. [10], Respondents raised the AEDPA statute of limitations, arguing that the present petition was time barred.  The Respondents also argued that the issues raised were meritless.

In response to the Answer, Petitioner filed on September 24, 2008, what he entitled a "Notice of Intent to Refute Commonwealth's Answer,"  Dkt. [13], and in that notice, he also requested a stay of this case pending the outcome of the civil rights action filed in the Eastern District at No. 06-2719.  The Court denied that stay on September 25, 2008.  Dkt. [14].  While this case was pending, Petitioner was moved in November 2008, from the prison in the Eastern District of Pennsylvania, to a prison located within the Western District of Pennsylvania.  Dkt. [19].

---

(a)  Defendant was under the influence of extreme mental or emotional disturbance. (42 Pa.C.S.A. 9711(e)(2)), and
(b)  Defendant acted under extreme duress although not such duress as to constitute a defense to prosecution under 18 Pa.C.S.A. 309 (relating to duress), or acted under the substantial dominating of another person. (42 Pa.C.S.A. 9711(e)(5)[)].
(7).  Trial counsel's failure to investigate the crime scene.
(8).  Trial counsel's failure to object to preserve and litigate, trial court's error of exceeding the sentencing guidelines as to the charges of Burglary, and Aggravated Assault[.]
(9).  Trial counsel's failure to raise, preserve and litigate trial court's error of allowing the jury to take a copy of the appellant's alleged statement into deliberation.
(10).  Trial counsel's failure to produce witnesses whose testimony would have been both admissable [sic] and critical to Appellant's defense, despite Appellant's written and verbal request:

(a).  Leroy Jones -
(b).  Harriet Wilson -
(c).  Allen Travillion -

(11).  Trial counsel's failure to employ an independent Ballistic Expert

3.  Appellate counsel's failure to raise, preserve and litigate the above, could not have been the result of any rational, strategic or tactical decision by counsel and hence, has twice denied the appellant his Pennsylvania and U.S. Constitutional rights to Effective Assistance of Counsel; Due Process of Law; and Equal Protection (first during trial and secondly, on his first Appeal as of Right).

Griffin-El v. Diguglielmo, No. 2:07-CV-4995 (Dkt. [1-2] at 2 to 3).

### B.  Applicable Legal Standards

#### 1.  AEDPA applies

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, tit. I, §101 (1996) (AEDPA), which amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254, was effective April 24, 1996.  Because Petitioner's habeas petition was filed after the effective date of AEDPA, AEDPA is applicable to this case.  Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000) ("Since Werts filed his habeas petition on March 18, 1997, after the effective date of the AEDPA, we are required to apply the amended standards set forth in the AEDPA to his claim for federal habeas corpus relief.") (footnote omitted).

Prior to considering the merits of the habeas petition, a federal court must be satisfied that the procedural requirements for the consideration of a habeas petition have been satisfied.  Although exhaustion of state remedies is generally required before a federal court can grant relief, exhaustion is not required if the habeas court denies relief.  28 U.S.C. § 2254(b)(2).  In light of the recommended disposition, the court will not further address the issue of exhaustion.

#### 2.  AEDPA's Statute of Limitations

Generally AEDPA requires that state prisoners file their federal habeas petition within one year of any of four enumerated events:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>   (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;  or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post- conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Although a habeas respondent has the burden of affirmatively pleading AEDPA's statute of limitations, Hill v. Braxton, 277 F.3d 701, 705 (4th Cir. 2002), it is appropriate, where, as here, the habeas petitioner has been put on notice of a statute of limitations issue, to place some burden on the habeas petitioner to show why some date other than the date of the conviction becoming final should be used to calculate the running of the statute of limitations.  See, e.g., Smith v. Duncan, 297 F.3d 809, 814 (9th Cir. 2002) ("once a petitioner is given adequate notice and opportunity to respond to allegations that his petition is subject to dismissal pursuant to AEDPA's statute of limitations, petitioner has the burden of providing an adequate response"), abrogation on other grounds recognized in, Moreno v. Harrison, 245 Fed.Appx. 606 (9th Cir. 2007); Jackson v. Secretary for Dept. of Corrections, 292 F.3d 1347, 1349 (11th Cir. 2002); Robinson v. Johnson, 313 F.3d 128, 134-135 (3d Cir. 2002) ("The purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed.").

14

It is appropriate to place at least some burden of pleading and production on a habeas petitioner to show that the date for the running of the AEDPA limitations period should start from either the date a State created impediment was removed (28 U.S.C. § 2244(d)(1)(B)) or start from the date on which a factual predicate could first have been discovered (28 U.S.C. § 2244(d)(1)(D)).   See  Jackson v. Secretary for Dept. of Corrections, 292 F.3d at 1349 ("Because Jackson did not assert that a government-created impediment to his filing existed, that he based his claims on a right newly recognized by the Supreme Court, or that the facts supporting his claims could not have been discovered through due diligence before the filing of this petition, the statute of limitations must be measured from the remaining trigger, which is the date on which his conviction became final.").   Thus, once a habeas petitioner has been put on notice of the affirmative defense of AEDPA's statute of limitations, the petitioner bears the burden of producing some evidence and/or persuading the court as to why the date for the start of AEDPA's limitations period is other than the date the conviction became final or producing some evidence and/or persuading the court as to why the statute of limitations has not run.

In addition, to the extent that Petitioner seeks to equitably toll AEDPA's statute of limitations, he bears a heavy burden.  Equitable tolling can apply to AEDPA's statute of limitations.  Miller v. New Jersey State Dept. of Corrections, 145 F.3d 616 (3d Cir. 1998). However, the court cautioned in Miller about the limited nature of equitable tolling:

> equitable tolling is proper only when the "principles of equity would make [the] rigid application [of a limitation period] unfair."  Shendock, 893 F.2d at 1462. Generally, this will occur when the petitioner has "in some extraordinary way ... been prevented from asserting his or her rights."  Oshiver, 38 F.3d 1380.   The petitioner must show that he or she "exercised reasonable diligence in investigating and bringing [the] claims."  New Castle County, 111 F.3d at 1126.

Mere excusable neglect is not sufficient.   See Irwin v. Department of Veterans
Affairs, 498 U.S. 89, 96 (1990);  New Castle County, 111 F.3d at 1126.

Id. at 618-19.  Put succinctly, a habeas petitioner seeking to invoke the doctrine of equitable

tolling must establish "extraordinary circumstances."  Sandvik v. United States, 177 F.3d 1269,

1271 (11th Cir. 1999)("Equitable tolling is appropriate when a movant untimely files because of

extraordinary circumstances that are both beyond his control and unavoidable even with

diligence."), reh'g and suggestion for reh'g en banc denied, 207 F3d 666 (11th Cir. 2000).  In

order "[t]o establish the extraordinary circumstances necessary to equitably toll the AEDPA's

statute of limitations, a habeas petitioner must prove that the cause of his delay was both beyond

his control and unavoidable even with diligence."  Simmons v. Yukins, No. Civ. 01-CV-71287-

DT, 2001 WL 739505, at *2 (E.D. Mich. May 9, 2001).  See also  Pace v. DiGuglielmo, 544 U.S.

408, 418 (2005)("Generally, a litigant seeking equitable tolling bears the burden of establishing

two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstance stood in his way.").  Moreover, "the party seeking equitable tolling must have acted

with reasonable diligence throughout the period he seeks to toll."  Warren v. Garvin, 219 F.3d

111, 113 (2d Cir. 2000)(quoting Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000)).  Lastly,  it

is petitioner's burden to plead and prove entitlement to equitable tolling.  See, e.g., Polk v. Cain,

No. Civ. A. 00-3026, 2001 WL 736755, at *9 (E.D. La. June 23, 2001)("A person seeking the

tolling of the statute of limitations period has the burden of showing circumstances exist that

justify tolling."); Balagula v. United States, 73 F.Supp.2d 287, 291 (E.D.N.Y. 1999)("The burden

lays with the petitioner to establish the entitlement to equitable tolling."); Turner v. Singletary,

46 F.Supp.2d 1238, 1243 (N.D. Fla. 1999)("The burden is upon the petitioner to show that

equitable tolling is warranted.").

The Court of Appeals for the Second Circuit has explained the importance of AEDPA's

statute of limitations.  Acosta v. Artuz, 221 F.3d 117, 123 (2d Cir. 2000).  In Acosta, the Court

of Appeals declared that

> The statute of limitation in Section 2244(d) "was Congress' primary
> vehicle for streamlining the habeas review process and lending finality to
> state convictions." *Walker v. Artuz*, 208 F.3d 357, 361 (2d Cir. 2000); *cf.*
> *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (stating that on collateral review,
> courts should "accommodate [ ] ... the systemic interests in finality ... and
> conservation of judicial resources"). The AEDPA statute of limitation
> promotes judicial efficiency and  conservation of judicial resources,
> safeguards the accuracy of state court judgments by requiring resolution of
> constitutional questions while the record is fresh, and lends finality to state
> court judgments within a reasonable time. Like the other procedural bars
> to habeas review of state court judgments, the statute of limitation
> implicates the interests of both the federal and state courts, as well as the
> interests of society[.]

Acosta v. Artuz, 221 F.3d at 123.  Accord Hill v. Braxton, 277 F.3d 701, 706 (4th Cir. 2002)

("The one-year limitations period ... promotes judicial efficiency and conservation of judicial

resources safeguards the accuracy of state court judgments by requiring resolution of

constitutional questions while the record is fresh, and lends finality to state court judgments

within a reasonable time.")(internal citations omitted).

### C.  Discussion

#### 1.  The Petition is Time Barred

The Respondents point out that Petitioner's instant petition is untimely because it was not

filed within one year of his conviction becoming final.  This court agrees.

Petitioner's conviction became final 90 days after April 10, 2001, which is the date whereon the Pennsylvania Supreme Court denied the counseled PAA in his direct appeal from his conviction.  See United States Supreme Court Rule 13 (providing that a petition for certiorari must be filed no later than 90 days after entry of an order denying discretionary review by the state court of last resort); Stokes v. District Attorney of Philadelphia, 247 F.3d 539, 542 (3d Cir. 2001)(explaining that AEDPA's phrase "became final by ... expiration of time for seeking [direct] ... review" includes the 90 days time in which to seek certiorari); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999).   Ninety days after April 10, 2001 is July 9, 2001.

Accordingly, AEDPA's statute of limitations began to run as of July 9, 2001 and continued to run until June 24, 2002, the date whereon Petitioner signed his PCRA petition and the date whereon he is deemed to have filed that PCRA petition under the so-called prisoner mail box rule.[3]  Hence, from July 9, 2001 until June 23, 2002,[4] a total of 349 days of AEDPA's 365

---

[3]  Under the law of Pennsylvania, a *pro se* prisoner is deemed to have filed his or her PCRA petition on the date the petition was delivered to prison officials as Pennsylvania applies the prisoner mail box rule to prisoners' filing of PCRA petitions.  Commonwealth v. Little, 716 A.2d 1287, 1288 (Pa. Super. 1998).  The "prisoner mail box rule" provides that a prisoner's legal filings are "deemed filed on the date that the prisoner deposits the appeal with prison authorities, or places it in a prison mailbox."  Id. In this case, the Petitioner has not presented this court with proof of the date upon which he delivered his PCRA petitioner to prison officials to mail.  Absent proof of the exact date of delivering the petition to the prison authorities, the court should treat the date whereon the Petitioner signed his petition, as the filing date. Rhodes v. Senkowski, 82 F.Supp.2d 160, 165 (S.D.N.Y. 2000) ("Absent evidence to the contrary, the Court assumes that Rhodes gave his petition to prison officials for mailing on the date he signed it, February 9, 1998."); Hudson v. Martin, 68 F.Supp.2d 798, 799, n.2 (E.D. Mich.1999), *aff'd*, 8 Fed.Appx. 352 (6th Cir. 2001).

[4]  The court does not count June 24, 2002, as the last day because that is the date on which Petitioner is deemed to have filed his PCRA petition and hence it is the first day or part of a day on which the PCRA was "pending," which requires AEDPA's statute of limitations to be tolled, i.e., not counted.  See Freeman v. Pew, 59 F.2d 1037, 1037 (D.C. Cir. 1932) ("it has long been the settled doctrine that the law, disregarding fractions, takes the entire day as the unit of time."); In re Susquehanna Chemical Corp., 81 F.Supp. 1, 9 (W.D. Pa. 1948)(general rule is that fractions of a day are to be disregarded), *aff'd*, 174 F.2d 783 (3d Cir. 1949).

day statute of limitations ran.  The rule is that a properly filed PCRA petition, which is filed and/or pending, including the time for taking appeals of any denial of PCRA relief, tolls the running of AEDPA's one year limitations period.  See 22 U.S.C. § 2244(d)(2); Swartz v. Meyers, 204 F.3d 417, 420 (3d Cir. 2000) (AEDPA's one year limitation period continues to be tolled during the period of taking a timely appeal from the denial of post-conviction relief and during the appellate court's consideration of the appeal).

The pro se PCRA petition remained pending only until 30 days after November 20, 2006, the date whereon the Superior Court dismissed his PCRA appeal for failure to file a brief, where Petitioner did not file a PAA to the Pennsylvania Supreme Court.  Mattis v. Klopotoski, Civ.A. 07-1837, 2008 WL 2909859, at * 3 (E.D.Pa., July 28, 2008)("That petition remained pending until December 8, 2006, when the time expired for Mattis to seek review in the Pennsylvania Supreme Court. See Pa. R.A.P. 1113(a) (allowing 30 days for the filing of an allocatur petition); Swartz v. Meyers, 204 F.3d 417, 421-22 (3d Cir. 2000) (state collateral petition is pending through the time for seeking an appeal)."); Young v. Lawler, CIV.A. 07-4171,  2008 WL 1984059, at *4 (E.D.Pa. May 2, 2008) (the 30 day period for filing allocatur to Pennsylvania Supreme Court tolled the running of AEDPA's statute of limitations even if no allocatur petition was filed).  Thirty days after November 20, 2006 is December 20, 2006.  Hence, as of December 21, 2006, AEDPA's statute of limitations began to run again and continued to run until Petitioner is deemed to have filed the present petition on November 19, 2007, nearly one full year to the date after the Superior Court dismissed the PCRA appeal.   From December 21, 2006 until November 19, 2007, a total of 333 days passed.   Adding these 333 days to the 349 days that passed between his conviction becoming final and his filing of the PCRA petition, totals 682

days, which is clearly beyond the 365 days permitted by AEDPA's statute of limitations.  Hence, the petition is untimely filed.

Petitioner did not explicitly argue for equitable tolling.  However one can infer from his petition, that he may be seeking equitable tolling based upon the seizure of his legal materials on August 4, 2005 and on May 5, 2006.  However, we do not find that Petitioner's mere recitation of the facts surrounding the seizure of his legal materials has carried his heavy burden to show "extraordinary circumstances" so as to warrant equitable tolling of AEDPA's statute of limitations.  See, e.g., Giraldes v. Ramirez-Palmer, No. C 98-2757, 1998 WL 775085 at *2 (N.D.Cal. Nov. 3, 1998) (impediment occurred "over eleven months into his one year period (and over eighteen months after his conviction became final), which gave [petitioner] many months before any problem developed at the prison to work on his petition," and thus no equitable tolling of AEDPA period).

In the alternative, Petitioner could be seeking not equitable tolling, but to have AEDPA's statute of limitations begun not from the date his conviction became final but from the date a state created impediment was removed.  28 U.S.C. § 2244(d)(1)(B).  However, as a matter of logic, there are significant problems with such an argument.  First, the state created impediment (i.e., lack of legal papers) has not yet been removed and so, it would seem that his statute of limitations has not yet even begun to run under this argument.  Moreover, it seems to this court that because the events Petitioner relies upon to apparently excuse compliance with AEDPA's limitations period did not occur until long after his conviction became final (which occurred on July 9, 2001 and the first seizure of his materials did not occur until August 4, 2005), it would be inconsistent with AEDPA's statutory purpose, if not language, to start anew the running of the

AEDPA limitations period from a date later than the date whereon his conviction became final.

See Ortega v. Schriro, No. CV 07-02063, 2009 WL 531867, at * 9 (D.Ariz.  March 3, 2009)("In

this case, however, Petitioner's legal files were alleged to be lost in approximately May, 2007.

Thus, even if the lost legal files constituted an 'impediment to filing an application created by

State action in violation of the Constitution or laws of the United States,' 28 U.S.C. § 2244(d)(1),

the impediment did not occur until well after Petitioner's statute of limitations had run" as

calculated from the date of the conviction becoming final); Walls v. Tambi, No. 1:05CV0202,

2005 WL 1965965, at *6 n.7 (N.D.Oh. Aug. 15, 2005) (Petitioner Walls alleged "a series of

events beginning on August 22, 2000 and continuing until October 1, 2004 which, according to

Walls, constituted state-created impediments to Walls' filing a petition for a federal writ of

habeas corpus. Id. at 9-11. Even if Walls' allegations are true, the statutory period [as calculated

from the date his conviction was deemed to have become final, i.e., at the end of the one year

grace period following AEDPA's enactment]  had expired well before the alleged events

occurred").   An example illustrates that it would be inconsistent with AEDPA's statutory

purpose of "requiring resolution of constitutional questions while the record is fresh"[5] if we were

to start anew the running of the AEDPA limitations period from a date later than the date

whereon Petitioner's conviction became final based upon a State-created  impediment that did

not occur until after the conviction had become final.   Suppose a prisoner waited for more than

five years after his conviction became final to file his first state collateral petition.  Let's further

suppose that during the pendency of these state collateral proceedings, the State created an

---

[5]  Acosta v. Artuz, 221 F.3d at 123. Cf.  U.S. v. Bendolph, 409 F.3d 155, 163 (3d Cir. 2005)
(recognizing "Congress['] inten[t] to reduce ... delayed and repetitive [habeas] filings")(quoting  Kapral
v. United States, 166 F.3d 565, 571 (3d Cir. 1999)).

impediment to the prisoner's filing of his federal habeas petition.  After the impediment is removed and state collateral proceedings conclude, the petitioner then files his federal habeas petition.  Would anyone doubt that the habeas petition would be deemed untimely filed notwithstanding the existence of the State created impediment, given that if the petitioner had attempted to file a habeas petition during the one year following his conviction having become final, when no impediment existed, he could have done so.  In other words, a State created impediment that occurs only after the conviction became final does not restart the AEDPA statute of limitations.

Hence, to be explicit, the rule that is derived from the foregoing is the following.  In order to avoid an absurd result as demonstrated by the example given immediately above,[6] the AEDPA statutory language must be read with the interpolation as follows concerning the State created impediment section:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>> (B) the date on which the impediment to filing an application created by State action [**which impediment occurred prior to the judgment of conviction becoming final**] in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

Hence, if the State created impediment occurs after the judgement of conviction becomes final, then the state created impediment will not restart the statute of limitations from the date when the

---

[6] "All statutes must be construed in the light of their purpose. A literal reading of them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose."  Haggar Co. v. Helvering, 308 U.S. 389, 394 (1940).

impediment is removed but will merely serve to equitably toll the running of the statute of

limitations from the time the impediment is put into place until the time it is removed.

Accordingly, the Court finds that the habeas petition is untimely filed as measured from the date

the conviction became final and that no other statutory date for commencement is applicable.[7]

---

[7] There is only one possible exception to this.  Petitioner claimed in the PCRA petition filed back in June 2002, that he had "recently become aware of the fact that he has been diagnosed with the following mental disorders and that he was afflicted with said disorders at the time he committed the charged crimes: Post-traumatic Stress Disorder; Borderline Personality Disorder; Major Depression; and Intermittent Explosive Disorder."  Dkt. [11-6] at 8.  Furthermore, he claimed both in the PCRA petition and in the instant habeas petition that the absence of evidence concerning these disorders especially during the guilt phase denied him a fundamentally fair trial.  An argument could be made that the AEDPA statute of limitations should begin to run **as to this claim** from the date he made such a discovery.  28 U.S.C. § 2244(d)(1)(d) (starting AEDPA's statute of limitations from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence").  However, Petitioner does not make such an argument.  Nor would such an argument be persuasive.  We note that at the sentencing phase of the trial, Dr. Wettstein, a psychiatrist testified that Petitioner suffered from a "personality disorder" Trial Transcript, at 773, line 2, and that he has a history of "being explosively angry" id., at 774, lines 17 to 18.  Hence, as early as September 1996, when Dr. Wettstein testified at the sentencing phase (which, obviously is prior to Petitioner's conviction becoming final), there was evidence of Petitioner's mental health being impaired.  We find that Petitioner has not established as is his burden that he could not have earlier discovered with diligence the factual premise of his mental health claims and his claim of an allegedly unfair trial without such evidence.  Redmond v. Jackson, 295 F.Supp.2d 767, 772 (E.D.Mich. 2003)(citations omitted), wherein the court held as follows:

> a habeas petitioner has the burden of proof in establishing that he exercised due diligence in searching for the factual predicate of the habeas claims. \
>
> Here, Petitioner claims that he had newly discovered evidence of his innocence in the form of an affidavit from a co-defendant, Mark Ford, which Petitioner claims that he did not receive until January 14, 1998.  . . . . The primary problem the Court has with invoking § 2244(d)(1)(D) to allow the one-year period to run from the date of the discovery of this evidence is that Petitioner has failed to offer any explanation how the factual predicate of his claims could not have been discovered earlier, nor does he indicate what steps, if any, he took to discover these claims. Because Petitioner does not indicate when he discovered the factual predicate of his claims, the Court is unable to determine when the one-year period would commence pursuant to § 2244(d)(1)(D). This Court is unable to accept any argument from Petitioner that the factual predicate for his claims could not have been discovered sooner because any such argument is unsupported and conclusory. *Id.* In particular, Petitioner cannot invoke the provisions of § 2244(d)(1)(D) with respect to Mark Ford's affidavit because Petitioner does not state when he learned about the underlying facts contained in Ford's affidavit.

Nor has Petitioner met his burden to establish entitlement to equitable tolling.  Hence, the petition should be dismissed as time barred.

### 2.  The Petition is Meritless

In the alternative, the petition should be dismissed as meritless.  The Respondents pointed out in their answer that the State Court's disposition of Petitioner's issues, i.e., the PCRA trial Court's order dismissing the PCRA petition for the reasons stated in the notice of intent to dismiss (Dkt. [11-7] at 2 to 4), was neither contrary to nor an unreasonable application of Supreme Court precedent.  We further note that Petitioner has not argued or contended otherwise.  Nowhere does Petitioner explicitly argue that the State Court's adjudication of his claims was contrary to or an unreasonable application of any United States Supreme Court case, as is his burden.  Downing v. Del Papa, 145 Fed.Appx. 578, 580 (9th Cir. 2005)("Downing fails to **argue** how the Nevada Supreme Court's judgment resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States")(emphasis added); Anderson v. Secretary for Dept. of Corrections, 462 F.3d 1319, 1325 (11th Cir. 2006)("Petitioner had not met his burden of showing the state courts' decisions were 'contrary to' or 'an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States.'");  Sepulveda v. U.S., 330 F.3d 55, 66 (1st Cir. 2003) (AEDPA requires state "petitioners to bear a different burden; they must demonstrate that the state court's adjudication of the claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"); Peterson v. Krysevig, Civ. A. No. 07-947, 2008 WL 4372940, at *8 (W.D.Pa., Sept. 22, 2008)("it is petitioner's burden

to prove the state courts' disposition of a federal claim is either contrary to or an unreasonable application of clearly established federal law.") (*citing* Matteo v. Superintendent, SCI-Albion, 171 F.3d 877, 888 (3d Cir. 1999)(en banc)).  Hence, based on his failure to even argue the AEDPA standards, Petitioner fails to establish entitlement to relief under AEDPA.  Neither has Petitioner carried his burden to show that the PCRA trial Court's disposition constituted an unreasonable determination of the facts in light of the record evidence.  Stenson v. Lambert, 504 F.3d 873, 883 (9th Cir. 20 07)("But Stenson's burden under 28 U.S.C. § 2254(d)(2) is to demonstrate that the Washington court's finding that his request was equivocal 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'").  Moreover, we affirmatively find that the PCRA trial court's disposition of Petitioner's claims are neither contrary to nor an unreasonable application of then extant United

States Supreme Court precedent.[8]   Nor, did the PCRA trial court unreasonably determine any

_____

   [8]  In this vein, we note the following with respect to Petitioner's claim that his direct appeal counsel was ineffective for failing to raise trial counsel's alleged ineffectiveness for failing to present the testimony of Dr. Wettstein during the guilt phase so as to establish the defense of diminished capacity under State law.   The PCRA Court rejected this claim, noting that "Dr. Wettstein's testimony during the penalty phase did not offer the opinion that the defendant suffered from diminished capacity." Dkt. [11-7] at 3.  We agree with this assessment.  The only testimony relevant, under State law, to this that Dr. Wettstein gave during the penalty phase was as follows: "[i]t is my view that he [i.e., Petitioner] did not at that time [of the crime] have the ability to conform his conduct to the requirements of the law." T.T. at 774, lines 12 to 14.  This is emphatically not the kind of evidence that qualifies as evidence of "diminished capacity" under State law.  As cogently explained

> Diminished capacity is an extremely limited defense under Pennsylvania law. Pennsylvania trial courts, like their federal counterparts, must carefully scrutinize psychiatric defense theories bearing on mens rea. *See United State v. Pohlot*, 827 F.2d 889 (3d Cir.1987) (Holding that the federal Insanity Defense Reform Act of 1984, 18 U.S.C. § 17, did not bar all evidence of mens rea, but it does "require the exclusion of evidence that does not support a legally acceptable theory of a lack of mens rea." *Id*. at 906. "Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires." *Id*. at 890. "In light of strong danger of misuse, we join other circuits that have directed district courts to examine proffered psychiatric testimony carefully 'to determine whether the proof offered is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in deciding the ultimate issues.' " *Id*. at 905).
>
> Before a defendant may introduce expert mental health evidence at trial to support a diminished capacity defense, Pennsylvania law requires that he or she establish that the evidence is relevant and probative on the issue of specific intent. Only expert mental health testimony that "speaks to mental disorders affecting the cognitive functions necessary to formulate a specific intent" is relevant and admissible. Where the proffered expert mental health evidence does not speak to those mental disorders that affect cognitive functions, the evidence "is irrelevant and hence inadmissible." Moreover, the Pennsylvania Supreme Court has "repeatedly rejected the contention that evidence of a defendant's supposed inability to control his actions-by virtue of an 'irresistible impulse,' a 'compulsion,' or otherwise-is relevant to negate specific intent, and [the court has] consistently held that such evidence may not be admitted in support of a diminished capacity defense." *Taylor*, 876 A.2d at 926-27 (collecting cases); *Zettlemoyer*, 454 A.2d at 949 ("[N]either social maladjustment, nor lack of self-control, nor impulsiveness, nor psycho-neurosis, nor emotional instability, ... nor all such conditions combined" "bear upon the narrow defense of diminished capacity.").

Woo v. Beard, No. Civ.A. 05-1105, 2006 WL 3813986, at *1 n.2 (W.D.Pa. Dec. 27, 2006)(some citations omitted).  Hence, here, unlike in Stevens v. Horn, 187 Fed.Appx. 205, 209 n.5 (3d Cir. 2006), *cert. granted, judgment vacated by*, Beard v. Stevens, 551 U.S. 1111 (2007),we have a State Court finding that, under State law, the evidence presented by Dr. Wettstein does not constitute evidence of diminished

facts.  Accordingly, the petition should be dismissed as meritless.

### D.  Certificate of Appealability

Section 2253 of Title 28 U.S.C. generally governs appeals from district court orders regarding habeas petitions.  Section 2253 essentially provides in relevant part that a certificate of appealability, which is a prerequisite for allowing an appeal to a Court of Appeals, should not be issued unless the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (C)(2).  Instantly, this court concluded that Petitioner's habeas petition was time barred and/or in the alternative, that the claims raised afforded no grounds for relief.

There is a difficulty in applying Section 2253(C)(2) when a District Court does not decide the case on the merits, i.e., declines to address questions of constitutional violations, but instead decides the case on a procedural ground without determining whether there has been a denial of a constitutional right.  See, e.g., Slack v. McDaniel, 529 U.S. 473 (2000); Walker v. Government of The Virgin Island, 230 F.3d 82, 89-90 (3d Cir. 2000).

In resolving this difficulty, the Supreme Court in  Slack v. McDaniel, held that

[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

---

capacity.  Owing deference to that finding of State law, we conclude that the PCRA Court's implicit finding that Petitioner's appellate counsel was not ineffective for failing to raise this meritless issue of trial counsel's ineffectiveness simply does not constitute an adjudication that was contrary to or an unreasonable application of United States Supreme Court precedent. Werts v. Vaughn, 228 F.3d 178, 202 (3d Cir. 2000) ("counsel cannot be deemed ineffective for failing to raise a meritless claim").

Slack v. McDaniel, 529 U.S. at 484.   Hence, the analysis as to whether a certificate of appealability should issue to review a procedural question, has "two components, one directed at the underlying constitutional claims and one directed at the district court's procedural holding." Id. at 473.   The test is conjunctive and both prongs must be met.   See Walker v. Government of the Virgin Islands, 230 F.3d at 90.

Applying this standard to the instant case, the court concludes that jurists of reason would not find it debatable whether dismissal of the Petitioner's claims for failing to comply with AEDPA's statute of limitations and/or that he failed to carry his burden to show entitlement to relief under AEDPA was correct.   Accordingly, a certificate of appealability should be denied.

Pursuant to the Magistrates Act, 28 U.S.C.   § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the parties are allowed to file objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.   Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/ Amy Reynolds Hay
Chief United States Magistrate Judge

Dated: 12 November, 2009

cc:   The Honorable Nora Barry Fisher
United States District Judge

K. Kabasha Griffin-El
DB-7067
SCI Greensburg
165 SCI Lane
Greensburg, PA 15601

Counsel of Record via CM-ECF

28